In re JOHN RICHARDS HOMES BUILDING COMPANY, L.L.C., Debtor.

Kevin Adell, Appellant,

v.

John Richards Homes Building Company, L.L.C., Appellee.

Bankruptcy No. 02–54689. Civ. No. 03–40109.

United States District Court, E.D. Michigan, Southern Division.

Aug. 5, 2004.

George La Plata, Alan R. Miller Assoc., Birmingham, MI, Ralph E. McDowell, Bodman, Longley, (Detroit), Detroit, MI, for Appellant.

Norman C. Ankers, Honigman, Miller, (Detroit), Detroit, MI, Ruth E. Zimmerman, Honigman, Miller, (Lansing), Lansing, MI, for Appellee.

## *OPINION AND ORDER AFFIRMING THE DECISION OF THE BANKRUPTCY COURT*

GADOLA, District Judge.

On April 25, 2003, the Honorable Steven W. Rhodes, Chief Judge, United States Bankruptcy Court for the Eastern District of Michigan, entered a $6,413,230.68 judgment in favor of Appellee John Richards Homes Building Company ("JRH") and against Appellant Kevin Adell pursuant to 11 U.S.C. § 303(i). Thereafter, Mr. Adell instituted this appeal. *See* 28 U.S.C. § 158(a)(1). The Court heard oral arguments on the appeal on April 20, 2004. For the reasons set forth below, the Court will affirm the bankruptcy court's judgment.

## I. BACKGROUND

JRH builds luxury homes. JRH is one of several construction-related entities run by John and Janet Shekerjian. On December 28, 2001, JRH and Mr. Adell entered into a contract for the sale of a 1.8 acre parcel of land in Bloomfield Hills, Michigan, and for the construction of a home on that land in exchange for $3,030,000.00.

The contract required JRH to commence construction within a reasonable time after the contract was signed, the plans were completed, and a permit was issued. The sale closed on February 28, 2002. The closing papers allocated $1,750,000.00 for the purchase of the land and the balance, $1,280,000.00, for the construction of the home.

Thereafter, two primary disputes developed. First, Mr. Adell asserted that the true value of the land was $1,000,000.00 rather than the $1,750,000.00 stated in the closing papers and in the deed. Thus, Mr. Adell contended that the excess of $750,000.00 was actually an improper initial construction draw to which JRH was not entitled. Second, Mr. Adell asserted that the delays in commencing construction were unreasonable.

On June 6, 2002, Mr. Adell filed suit in the Oakland County Circuit Court against JRH and others, alleging fraud and misrepresentation, silent fraud, innocent fraud, breach of contract, Consumer Protection Act violations, unjust enrichment, accounting, and constructive trust. On June 18, 2002, JRH filed an answer denying the substance of Mr. Adell's claims and affirmative defenses as well as a countercomplaint alleging breach of contract, business defamation, business libel, injurious falsehood, tortious interference with business relations, and extortion. Further, JRH filed an emergency motion for a temporary restraining order and a preliminary injunction. These filings by JRH are important because they indicate that Mr. Adell's claims against JRH were in dispute.

On June 24, 2002, Mr. Adell filed an involuntary bankruptcy petition against JRH in the United States Bankruptcy Court for the Eastern District of Michigan. The involuntary petition was assigned Bankruptcy Case No. 02–54689 and is the origin of this appeal. The involuntary petition alleged that Mr. Adell had an undisputed claim against JRH for $800,000.00 due to JRH's purported fraud and breach of contract. Mr. Adell alleged that he was eligible to file the involuntary petition under 11 U.S.C. § 303(b) because he had a claim against JRH that was not the subject of a bona fide dispute.

■ When relief is sought under § 303(b), the claim against the alleged debtor cannot be "contingent as to liability or the subject of a bona fide dispute." 11 U.S.C. § 303(b)(1). Accordingly, "[i]f there is a legitimate legal or factual basis for the alleged debtor not to pay the claim, then the creditor is not eligible to file an involuntary petition." *In re Troutman Enters., Inc.*, 253 B.R. 8, 12 (6th Cir. BAP 2000).

On July 1, 2002, JRH filed a motion to dismiss the involuntary petition. JRH asserted that Mr. Adell's claim was the subject of a bona fide dispute, as the underlying dispute was still in the very early stages of contested litigation in Oakland County Circuit Court. Moreover, JRH contended that Mr. Adell's involuntary petition was filed in bad faith and that, as a result, JRH was entitled to compensatory and punitive damages as well as attorney fees and costs under § 303(i).

On July 15, 2002, the bankruptcy court dismissed Mr. Adell's involuntary petition, finding that Mr. Adell "knew or surely must have known that his claim was the subject of a bona fide dispute, and therefore that he was not qualified to be a petitioning creditor." Mr. Adell did not appeal that dismissal. Therefore, the issue of whether that dismissal was proper—i.e., whether Mr. Adell's claim was the subject of a bona fide dispute—is not before the Court. In other words, the dismissal of Mr. Adell's involuntary petition was proper because his claim was the subject of a bona fide dispute.

Further, at the time of dismissal, the bankruptcy court found that the record was insufficient to determine if, as JRH alleged, Mr. Adell had filed his petition in bad faith, and, if so, the appropriate amount of damages to which JRH was entitled under § 303(i). Therefore, the bankruptcy court directed the parties to conduct discovery into the matter and set a trial date. The bankruptcy court conducted a bench trial on December 18, 2002, and January 14, 2003.

On April 25, 2003, the bankruptcy court concluded that the involuntary petition was filed in bad faith, issued an opinion regarding JRH's damages, and entered a $6,413,230.68 judgment under § 303(i) in favor of JRH and against Mr. Adell: $4,100,000.00 in compensatory damages, $2,000,0000 in punitive damages, $285,379.00 in attorneys fees, and $27,851.68 in costs. *See In re John Richards Homes Bldg. Co., L.L.C.*, 291 B.R. 727, 731–40 (Bankr.E.D.Mich.2003). On May 2, 2003, Mr. Adell instituted this appeal.

## II. STANDARD OF REVIEW

■ "District courts review a bankruptcy court's conclusions of law de novo." *In re McNamara*, 275 B.R. 832, 835 (E.D.Mich.2002) (Gadola, J.). "A district court will not disturb a bankruptcy court's findings of fact, however, unless those findings were clearly erroneous." *Id.* Further, "[m]ixed questions of law and fact must be separated into their constituent parts and each analyzed using the appropriate stan-

dard of review." *In re Eagle–Picher Indus., Inc.*, 285 F.3d 522, 527 (6th Cir.2002).

## III. ANALYSIS

In the body of his appellate brief, Mr. Adell challenges four aspects of the bankruptcy court's decision. First, Mr. Adell contends that his involuntary petition was not filed in bad faith. Second, Mr. Adell claims that the bankruptcy court's compensatory damages determination was substantially flawed. Third, Mr. Adell argues that the bankruptcy court erred in awarding punitive damages. Fourth, Mr. Adell contests the bankruptcy court's award of fees and costs.

### A. Bad Faith

In his primary attack, Mr. Adell contends that his involuntary petition was not filed in bad faith. Whether a § 303 involuntary petition is filed in bad faith is a question of fact, which is reviewed under the deferential standard of clearly erroneous. *See In the of Matter Washtenaw/Huron Inv. Corp. No. 8*, 160 B.R. 74, 79 (E.D.Mich.1993); *In re Landmark Distribs., Inc.*, 189 B.R. 290, 309 (Bankr. D.N.J.1995).

After examining the totality of the circumstances, *see Washtenaw/Huron*, 160 B.R. at 78–79; *In re Cadillac by DeLorean & DeLorean Cadillac, Inc.*, 265 B.R. 574, 581–82 (Bankr.N.D.Ohio 2001), the bankruptcy court determined that Mr. Adell filed his involuntary petition against JRH in bad faith as a means of (1) intimidating JRH's principal, Mr. Shekerjian, into a settlement of the underlying disputes and, when that failed, (2) damaging and/or destroying Mr. Shekerjian's business.

The bankruptcy court supported this determination with seven findings. One, when Mr. Adell filed this involuntary bankruptcy petition, he knew or should have known that, given the procedural posture of the lawsuit in Oakland County, his claims against JRH were the subject of a bona fide dispute. Two, Mr. Adell knew of the serious harm that JRH would suffer as a direct consequence of the involuntary filing and intended to cause such harm.[1] Three, this threatening behavior was consistent with Mr. Adell's prior threats of criminal prosecution against Mr. Shekerjian. Four, although Mr. Adell's involuntary petition (signed under penalty of perjury) stated that Mr. Adell had an $800,000.00 claim against JRH for fraud and breach of contract, Mr. Adell was unable to articulate how that amount was calculated. Five, Mr. Adell used improper threats and flaunted his wealth in an attempt to solicit creditors to join his involuntary petition. Six, Mr. Adell deliberately withheld evidence from his bankruptcy counsel thereby invalidating Mr. Adell's testimony that he filed the petition in reliance on the advice of experienced bankruptcy attorneys. Seven, Mr. Adell falsely testified that in filing the involuntary petition, he was motivated by a concern for JRH's trade creditors.[2]

On appeal, Mr. Adell raises two challenges to the bankruptcy court's bad faith determination. First, Mr. Adell claims

---

1. The bankruptcy court found that (1) prior to filing the involuntary petition, Mr. Adell threatened Mr. Shekerjian during a meeting about underlying disputes by asking: "Can your company take the hit to its reputation if an involuntary bankruptcy [is] filed?" and (2) Mr. Adell hired a public relations firm to publicize his involuntary bankruptcy filing against JRH. *JRH*, 291 B.R. at 732.

2. The bankruptcy court reasoned that, if Mr. Adell "were indeed so charitably motivated, he would not have threatened at least two creditors that the only way they would be paid would be to join in the petition." *JRH*, 291 B.R. at 735.

that he did, in fact, have an undisputed claim against JRH for $133,000.00. Second, Mr. Adell alleges that his reliance on advice of counsel negates a finding of bad faith.

### 1. Undisputed Claim

■ In the involuntary petition in this case, Mr. Adell stated that he had an undisputed claim for fraud and breach of contract against JRH in the amount of $800,000.00. *See* 11 U.S.C. § 303(b)(1); *Troutman*, 253 B.R. at 12. The bankruptcy court dismissed the petition, however, because it concluded that Mr. Adell's claim was the subject of a bona fide dispute, and Mr. Adell elected not to appeal that dismissal. Now, on appeal of the bankruptcy court's bad faith determination, Mr. Adell argues that there was indeed an undisputed claim against JRH for $133,000.00, and, as a consequence, he contends that this undisputed claim demonstrates that he did not file the involuntary petition in bad faith.

Mr. Adell's argument regarding this $133,000.00 claim is as follows. In the early stages of the contractual relationship, Mr. Adell paid JRH $133,000.00 toward construction costs. Mr. Shekerjian did not deposit this amount into JRH's account; rather he deposited the $133,000.00 into the account of a related entity known as John Richard Homes Construction, LLC. Mr. Adell argues that by not retaining his $133,000.00, JRH "indisputably" committed a breach of trust in violation of the Michigan Builders' Trust Fund Act ("MBTFA"). *See* Appellant Br. at 10; Mich. Comp. Laws § 570.151.[3] Mr. Adell therefore concludes that the

$133,000.00 claim was not the subject of a bona fide dispute.

This argument does not support a reversal of the bankruptcy court's bad faith determination for two reasons.

a. Even if Mr. Adell's legal analysis of the purported breach of trust is accurate and he was entitled to the $133,000.00 in question, this claim was still, contrary to Mr. Adell's conclusion, the subject of a bona fide dispute at the time he filed the involuntary petition. It was the subject of a bona fide dispute because JRH had "a legitimate legal [and] factual basis" for not paying this $133,000.00 claim. *Troutman*, 253 B.R. at 12; *see also In re Eastown Auto Co.*, 215 B.R. 960, 965 (6th Cir. BAP 1998).

JRH raises the following four points that adequately demonstrate its legitimate basis for not paying the $133,000.00 claim. First, although the funds were deposited in a JRH-related entity, which Mr. Shekerjian identified as a common paymaster, Mr. Shekerjian testified at trial that the funds were still held in trust for Mr. Adell's construction project. In fact, JRH filed a summary disposition motion in the Oakland County lawsuit accompanied by an affidavit establishing that the funds in question were held in trust. JRH provided a detailed accounting in the Oakland County suit showing that a portion of the funds were used for construction purposes (e.g., architectural drawings and foundation excavation) and that the remainder was held in trust for future construction expenses for Mr. Adell's construction project.

---

3. "In the building construction industry, the building contract fund paid by any person to a contractor, or by such person or contractor to a subcontractor, shall be considered by this act to be a trust fund, for the benefit of the person making the payment, contractors, laborers, subcontractors or materialmen, and the contractor or subcontractor shall be considered the trustee of all funds so paid to him for building construction purposes." Mich. Comp. Laws § 570.151.

██ Second, the MBTFA does not mandate a particular form or procedure for handling such trust funds. *See People v. Miller*, 78 Mich.App. 336, 345, 259 N.W.2d 877, 882 (1977). Rather, the MBTFA only prohibits the use of construction funds for purposes other than the project for which the funds were paid. *See* Mich. Comp. Laws 570.152.[4] Thus, "contractors [have] some measure of discretion in handling the trust funds" under the MBTFA, and JRH arguably acted within the scope of this discretion. *Miller*, 78 Mich.App. at 345, 259 N.W.2d at 882.

Third, JRH maintains that the other entity into which the funds were deposited was merely acting as JRH's agent, and there was nothing improper about JRH holding the funds in trust via its agent.

Fourth, JRH argues that money is fungible: if a contractor is required to hold $133,000.00 in trust, the law does not require the contractor to hold that specific $133,000.00 in trust; so long as the contractor has $133,000.00 at its disposal to pay construction costs, the contractor has complied with the MBTFA. *See Blair v. Trafco Prods., Inc.*, 142 Mich.App. 349, 355, 369 N.W.2d 900, 903 (1985) ("[T]he law presumes that the trust fund was not paid out so long as an amount equal to the trust fund remained.").

Therefore, whether the funds were held in trust was a legitimate dispute. Similarly, whether the deposit of funds into an entity other than JRH constituted a violation of the MBTFA was also a legitimate dispute. In other words, Mr. Adell's $133,000.00 claim was the subject of a bona fide dispute because there was a genuine issue of material fact concerning JRH's liability, as well as several "meritorious contention[s] as to the application of law." *Eastown*, 215 B.R. at 965. This conclusion is actually bolstered by Mr. Adell's oral argument here on appeal: during his oral argument before this Court, Mr. Adell's appellate counsel raised questions about the aforementioned *Blair* case, which thereby further demonstrates the existence of bona fide dispute on the MBTFA issue. *See Blair*, 142 Mich.App. at 355, 369 N.W.2d at 903; *Eastown*, 215 B.R. at 965. Consequently, Mr. Adell's argument concerning the purportedly undisputed $133,000.00 claim does not warrant reversal of the bankruptcy court's bad faith determination because it does not show that the determination was clearly erroneous.

b. There is another reason why Mr. Adell's argument about the $133,000.00 claim does not support reversal. Again, Mr. Adell's argument on appeal is as follows: I should not be held liable for acting in bad faith because I was motived by a good faith objective (i.e., the purportedly undisputed $133,000.00 claim) in bringing the involuntary petition.

██ In determining whether a petitioner has brought an involuntary petition in bad faith, a court is called upon to ascer-

---

4. "Any contractor or subcontractor engaged in the building construction business, who, with intent to defraud, shall retain or use the proceeds or any part therefor, of any payment made to him, *for any other purpose than to first pay laborers, subcontractors and materialmen, engaged by him to perform labor or furnish material for the specific improvement,* shall be guilty of a felony in appropriating such funds to his own use while any amount for which he may be liable or become liable under the terms of his contract for such labor or material remains unpaid, and may be prosecuted upon the complaint of any persons so defrauded, and, upon conviction, shall be punished by a fine of not less than 100 dollars or more than 5,000 dollars and/or not less than 6 months nor more than 3 years imprisonment in a state prison at the discretion of the court." Mich. Comp. Laws § 570.152 (emphasis added).

tain the petitioner's motives for filing the petition. *See Cadillac,* 265 B.R. at 581. In other words, a court must ask: what is the purpose or the objective of the petition? Or, more specifically: what is the undisputed claim at issue?

Before the bankruptcy court dismissed Mr. Adell's petition, it held a hearing regarding JRH's motion to dismiss on July 15, 2002. At this hearing, the bankruptcy court pressed Mr. Adell's attorney, Arnold Schafer, to describe the exact nature of Mr. Adell's allegedly undisputed claim, and the attorney did not even allude to the $133,000.00 breach-of-trust claim raised here on appeal. The transcript is quite telling on this point:

> THE COURT: Well, what is your claim, and how do you deal with the assertion that it is subject to a bona fide dispute?
>
> MR. SCHAFER: Number one, if [JRH] does not have a license,[5] they can't assert any defense they can't defend.
>
> THE COURT: Right. But what is your claim?
>
> MR. SCHAFER: That's one.
>
> THE COURT: No, but what's your claim? What do you seek? What's the theory?
>
> MR. SCHAFER: I seek damages for breach of contract.
>
> THE COURT: What's the breach?
>
> MR. SCHAFER: Failure to get this house started as promised. The second—this house cannot be built for the [$3,030,000.00 purchase price], and there will be plenty of expert testimony that I can show you that with. So whether there is a portion of our debt—you can't just say my debt is disputed and there-

fore go away. There has to be an underlying basis.... I'm saying one, they can't dispute it as a matter of law because there is no license, and two, ... this extra $277,000 [allocated to the price of the land] that appeared from one day to the next day is an undisputed chunk. And third, they can't produce the house.

> THE COURT: Well, but [JRH's] position is that given your client's agreement to that purchase price, at a minimum there's a bona fide dispute about it, about—your claim in that regard.
>
> MR. SCHAFER: Ultimately it doesn't matter. The issue is not how much the allocation[6] is to a particular piece of land; the issue is can this house be built .... So can this house be built for [$3,030,000.00]? They up-fronted it. They can't perform the contract....
>
> THE COURT: Right. So why—why shouldn't the Court hold that there is a bona fide dispute about that?
>
> MR. SCHAFER: Because it is not bona fide. Because I can introduce testimony a yard long that says this house with these specs cannot be produced.
>
> THE COURT: Why would your client enter into an agreement to build a house at a price that's impossible? Why would your client do that, unless he wanted to buy litigation.
>
> MR. SCHAFER: It wasn't impossible until the allocation occurs.
>
> THE COURT: But that's the allocation your client agreed to.
>
> MR. SCHAFER: With reservations.... As I indicated, the day before the clos-

---

5. This argument was incorrect. At all times pertinent to this controversy, JRH possessed a valid residential construction license issued by the Michigan Department of Consumer and Industry Services.

6. The closing papers allocated $1,750,000.00 for the purchase of the land and the balance, $1,280,000.00, for the construction of the home.

ing, the allocation to the lot went up $277,000 . . . .

THE COURT: Is there anything in this record from any witness in support of your position here that this house can't be built for the amount of the contract? . . .

MR. SCHAFER: [No, but] it's easily showable. . . .

THE COURT: Well, how do you deal with the argument of law that says that step one in an involuntary bankruptcy process is first to determine whether the creditor . . . in this case your client—is permitted to file because the claim is not a bona fide dispute? . . .

MR. SCHAFER: Because I don't think there is a bona fide dispute. It is *almost indisputable* that they can't build the house for the money.

THE COURT: Okay. Anything further?

MR. SCHAFER: No, your Honor.

Tr. (July 15, 2002) at 20–23 (emphasis added).

At oral argument, this Court asked Mr. Adell's appellate counsel to explain why Mr. Schafer failed to raise the $133,000.00 breach-of-trust claim on July 15, 2002. After fumbling for an answer, Mr. Adell's appellate attorney bluntly asserted that Mr. Schafer had made a mistake. This explanation is dubious given transcript segments above and Mr. Schafer's reputation as a topnotch bankruptcy attorney.

Moreover, Mr. Adell's written response to JRH's motion to dismiss, which was signed by Mr. Schafer's partner, Max Newman, is likewise devoid of any specific reference to a breach of trust or the allegedly undisputed $133,000.00 claim now raised here on appeal. *See* Adell Resp. (July 12, 2002) at 9–10.

Therefore, a mere three weeks after Mr. Adell filed his involuntary petition, the bankruptcy court gave Mr. Adell's attor-ney a golden opportunity to explain Mr. Adell's undisputed claim, and the proffered explanations did not include anything vaguely resembling the $133,000.00 claim raised here on appeal, which, according to Mr. Adell's appellate briefs, Mr. Schafer and Mr. Newman supposedly identified as an undisputed claim prior to filing the involuntary petition.

If this $133,000.00 claim was as vital and as salient as Mr. Adell now suggests here on appeal, he and his former attorneys would have voraciously raised the issue in response to JRH's motion to dismiss the involuntary petition. Instead, at the time the petition was instituted, Mr. Adell and his former attorneys proceeded as if this purported good faith objective did not exist. The failure to explicitly raise this claim when given the opportunity to do so by the bankruptcy court is a strong indication that this claim was not an objective behind the involuntary petition at the time the petition was filed. Rather, this purported good faith objective was manufactured after the fact, and the involuntary petition was motivated by other objectives, such as Mr. Adell's bad faith as found by the bankruptcy court. Given the utter implausibility of the $133,000.00 claim serving as a genuine reason for bringing the involuntary petition, this argument does not undermine the bankruptcy court's determination that Mr. Adell filed the petition in bad faith because it does not show that the determination was clearly erroneous.

### 2. Advice of Counsel

██ Mr. Adell further contends that his reliance on advice of counsel—i.e., his aforementioned bankruptcy attorneys, Mr. Schafer and Mr. Newman as well as their firm, Schafer & Weiner—in filing the involuntary petition vitiates the bankruptcy court's bad faith determination.

860

"Reliance on counsel does not excuse bad faith in the filing of an involuntary petition, but it may be considered on the favorable side of the ledger in such a consideration." Appellant Br. at 20 (quoting *In re Apache Trading Group, Inc.*, 229 B.R. 891, 894 (Bankr.S.D.Fla.1999)). Here, the bankruptcy court considered Mr. Adell's reliance on advice of counsel and rejected it because Mr. Adell deliberately withheld material information from his counsel that would have, or should have, made a difference on the pivotal issue of whether Mr. Adell's claim against JRH was the subject of a bona fide dispute. Mr. Adell withheld several items including (1) the fact that Mr. Adell explicitly agreed to the $1,750,000.00 allocation of the purchase price for the land as well as (2) JRH's answer and counterclaim from the Oakland County lawsuit. As illustrated by the above-quoted portions of the July 15, 2002, transcript in which Mr. Schafer erroneously argued that Mr. Adell had an undisputed breach of contract claim, it is clear that Mr. Adell's failure to provide this information to his bankruptcy attorney was material. Accordingly, the bankruptcy court correctly applied the following rule to Mr. Adell in this case: "It is fundamental that a client reasonably relies on an attorney's advice only when the client provides to the attorney *all* of the pertinent facts in the client's possession." *JRH*, 291 B.R. at 734–35 (emphasis added) (citing *United States v. United Med. & Surgical Supply Corp.*, 989 F.2d 1390, 1404 (4th Cir.1993); *C.E. Carlson, Inc. v. Sec. & Exch. Comm'n*, 859 F.2d 1429, 1436 (10th Cir.1988); *United States v. Eisenstein*, 731 F.2d 1540, 1543 (11th Cir.1984) ("In order to take advantage of [the defense of good faith reliance on the advice of counsel], the defendant must show that he relied in good faith after first making a full disclosure of *all* facts that are relevant to the advice for which he consulted the

attorney." (emphasis added))). Therefore, the defense of relying on advice of counsel is unavailable to Mr. Adell in this situation.

Moreover, there is an additional reason to reject Mr. Adell's advice-of-counsel argument. The bankruptcy court found that, under the totality of the circumstances, Mr. Adell "proceeded with the wrongful intent to intimidate [Mr.] Shekerjian into a settlement and, when that failed, to damage or destroy his business." *JRH*, 291 B.R. at 735. Further, prior to filing the involuntary petition, Mr. Adell threatened Mr. Shekerjian during a meeting about underlying disputes by asking: "Can your company take the hit to its reputation if an involuntary bankruptcy [is] filed?" *Id.* at 732. Additionally, Mr. Adell hired a public relations firm to publicize his involuntary bankruptcy filing against JRH. When, as here, the record "contains ample evidence of malice, spite, and ill-will . . . in the filing of the involuntary petition," such evidence will "defeat an advice of counsel defense." *Landmark*, 189 B.R. at 318; *see also In re Reveley*, 148 B.R. 398, 408 (Bankr.S.D.N.Y.1992) ("Where the petition is motivated by ill will or malice, reliance upon counsel's advice will not preclude a finding of bad faith on the part of the petitioner."). *Cf. In re Better Care, Ltd.*, 97 B.R. 405, 412–13 (Bankr.N.D.Ill.1989). Therefore, because the record establishes that Mr. Adell vindictively used the involuntary petition to inflict the highest degree of harm possible irrespective of his counsel's advice, he cannot avoid being held accountable for his actions. Thus, Mr. Adell's advice-of-counsel argument does not warrant reversal of the bankruptcy court's bad faith determination.

**B. Compensatory Damages**

Mr. Adell next claims that the bankruptcy court's compensatory damages

determination was substantially flawed. "[D]amages present a question of fact subject to review under the clearly erroneous standard." *Huss v. King Co., Inc.*, 338 F.3d 647, 652 (6th Cir.2003). The bankruptcy court's "unique perspective to evaluate the witnesses and to consider the entire context of the evidence must be respected." *In re Wakefield*, 293 B.R. 372, 382–83 (N.D.Tex.2003).

After determining that Mr. Adell filed his petition in bad faith, the bankruptcy court awarded JRH $4,100,000.00 in compensatory damages pursuant to 11 U.S.C. § 303(i)(2)(A). The bankruptcy court fashioned the award to compensate JRH for its lost profits proximately caused by the bad faith filing.

Mr. Adell now raises four challenges to the bankruptcy count's compensatory damages award. First, the award was impermissibly based on damages of non-parties. Second, future damages were entirely speculative. Third, certain damages were duplicative. Fourth, the bankruptcy court erroneously excluded expert testimony. The first and second arguments will be addressed together.

### 1. Damages of Non–Parties/Future Damages

At trial, Mr. Shekerjian testified that JRH had not sold a single home since Mr. Adell filed his involuntary petition. Also, JRH lost two high-end construction contracts that were about to close after months of negotiation because the customers were disturbed and confused by the bankruptcy petition. The uncertainty drove them away. Additionally, David Johnson, an official of Victor International Corporation, which is a leading firm in the high-end, luxury home market, testified that purchasers in the million-dollar-plus home market would have serious short-comings about contracting with JRH be-cause of the risk and uncertainty generated by Mr. Adell's involuntary petition. Further, Mr. Shekerjian and Mr. Johnson testified that the luxury home market remained strong despite the downturn in the economy at the time and that JRH's competitors were starting significant numbers of new homes in the relevant geographic area and price range. Consequently, JRH's loss of business was tied to Mr. Adell's petition and not the economy.

Mr. Adell claims that the compensatory award to JRH was based on the damages of non-parties, that is, Mr. Shekerjian's entities related to JRH. Mr. Adell also contends that the damages are speculative and, thus, improper. Mr. Adell's arguments, however, are misguided. While the bankruptcy court's compensatory damages calculation drew information from JRH-related entities, out of necessity, as described below, the compensatory award only compensates JRH for its damages. In addition, as described below, the damages were not overly speculative but rather grounded in a reasonable and conservative analysis of the financial harm caused by Mr. Adell's bad faith filing of the involuntary petition.

Prior to 2001, Mr. Shekerjian employed other JRH-related entities to engage in the construction of luxury homes. In January 2001, Mr. Shekerjian elected to streamline his business and created JRH to handle all of the luxury home projects from that point forward. At trial, Tom Frazee, a certified public accountant, testified as JRH's expert witness. Mr. Frazee explained that the best evidence of total sales and profits JRH would have generated but for Mr. Adell's involuntary petition, was the total sales and profit margins of Mr. Shekerjian's JRH-related entities that conducted the same business as JRH now conducts, i.e., the construction of high-end, luxury homes. Mr. Shekerjian's JRH-re-

lated entities had a five-year average of constructing approximately eight homes with an average sales price of $1,900,000.00.

Mr. Frazee's analysis assumed that JRH would have built the same number of luxury homes over the next five years, but, after Mr. Adell's petition was filed, JRH would build only half as many homes over the next five years, i.e., four per year. This analysis was conservative for at least two reasons: (1) to that point in time, JRH had not generated any new building projects since the petition was filed thereby suggesting that the four-per-year figure may be difficult to achieve, and (2) Mr. Shekerjian believed that it would take more than five years to repair JRH's reputation and regain the level of business it had prior to the involuntary petition. *See also* Appellee Br. at 43 n. 46. Nonetheless, using the four-per-year figure along with the identical price and profit margins from the period before the involuntary petition was filed, Mr. Frazee determined JRH's future damages, i.e., lost profits for the forthcoming five years, to be $4,100,000.00. The bankruptcy court adopted this figure.

■ Damages must be established to a **reasonable certainty**, and the existence of **some uncertainty** as to the amount of damages does not foreclose recovery. *See Broan Mfg. Co., Inc. v. Associated Distribs., Inc.,* 923 F.2d 1232, 1236 (6th Cir. 1991); *Blue Diamond Coal Co. v. United Mine Workers of Am.,* 436 F.2d 551, 561 (6th Cir.1970) ("It has long been recognized that once the fact of damage has been properly shown, uncertainty as to their amount will not foreclose recovery." (citations and internal quotations omitted)); *Kulling v. Grinders for Indus., Inc.,* 185 F.Supp.2d 800, 810 (E.D.Mich.2002) ("Nor is it especially worrisome that this element of uncertainty might have had an effect on the calculation of damages. To the contrary, calculations of future damages necessarily must rest upon a degree of prediction. *See Shore v. Fed. Express Corp.,* 42 F.3d 373, 378 (6th Cir.1994) (recognizing that 'future damages are often speculative')."). *See also Malloy v. Monahan,* 73 F.3d 1012, 1016–17 (10th Cir. 1996). The record clearly established that Mr. Adell's bad faith filing proximately caused considerable damage to JRH, and JRH provided the bankruptcy court with sufficient evidence to establish, to a reasonable certainty, JRH's lost profits that were caused by the bad faith filing. Thus, the bankruptcy court's reliance on evidence of total sales and profit margins of JRH-related entities to determine JRH's damages was not clearly erroneous.

### 2. Duplication

Mr. Adell further contends that certain damages were double counted. Mr. Adell believes that, in the $4,100,000.00 compensatory figure, Mr. Frazee and the bankruptcy court included $640,000.00 in lost profits for the two aforementioned contracts lost by JRH as an immediate and direct result of the uncertainty caused by Mr. Adell's involuntary petition. Thus, Mr. Adell cites this $640,000.00 as duplicative and requests that this $640,000.00 be deducted from the $4,100,000.00 compensatory award.

Mr. Adell is incorrect. This $640,000.00 represented JRH's past damages, not its future damages. The bankruptcy court only awarded future damages. In his testimony, Mr. Frazee made it very explicit that this $640,000.00 amount was not included in his $4,100,000.00 future profit figure. *See* Tr. (Dec. 18, 2002) at 148 ln.5–8 (I "calculated damages there associated with those projects at about $640,000, which would be in addition to the four—$4 million that I discussed previously."); *see also id.* at 147–48. The bankruptcy court

elected to only award the $4,100,000.00 figure for future lost profits. Had the bankruptcy court decided to also award the $640,000.00 in question, the total compensatory award would have been in the neighborhood of $4,740,000.00. Consequently, Mr. Adell's argument about duplicative damages is wholly without merit.

### 3. Expert Testimony

Mr. Adell further maintains that the bankruptcy court erroneously excluded expert testimony. Specifically, the bankruptcy court excluded Mr. Adell's damages expert, Gary Leeman, from testifying at trial.

■ Rule 26(a)(2) of the Federal Rules of Civil Procedure mandates that, when a party plans on using an expert witness, the party disclose a written report detailing, *inter alia*, the expert's "opinions to be expressed and the basis and reasons therefor." Fed.R.Civ.P. 26(a)(2)(B). "The purpose of Rule 26(a)(2) is to require disclosure of expert testimony sufficiently in advance of trial so that opposing parties have a reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses." *Wheeler v. FDL, Inc.*, No. 02–2444, 2003 WL 22843172, at *1 (D.Kan. Nov.17, 2003) (emphasis added).

■ When a party fails to disclose information in compliance with Rule 26(a)(2), Rule 37(c)(1) of the Federal Rules of Civil Procedure automatically disallows that party from using such expert evidence at trial unless there was a substantial justification for the noncompliance or unless the noncompliance was harmless. *See Sexton v. Uniroyal Chem. Co., Inc.*, 62 Fed.Appx. 615, 616 n. 1 (6th Cir.2003) ("This circuit has established that Rule 37(c)(1) mandates that a trial court sanction a party for discovery violations in connection with Rule 26(a) unless the viola-

tions were harmless or were substantially justified."); *see also Musser v. Gentiva Health Servs.*, 356 F.3d 751, 758 (7th Cir. 2004) ("The exclusion of non-disclosed evidence is automatic and mandatory under Rule 37(c)(1) unless non-disclosure was justified or harmless."). Further, the exclusion of evidence under Rule 37(c)(1) is proper even when the exclusion makes "it much more difficult, perhaps almost impossible, for [the violating party] to rebut [the opposing party's] damages calculations." *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir.2001).

■ A trial court's imposition of such a sanction under Rule 37(c)(1) is reviewed under the abuse of discretion standard. *See Sommer v. Davis*, 317 F.3d 686, 692 (6th Cir.2003). "Abuse of discretion is defined as a definite and firm conviction that the trial court committed a clear error of judgment." *Tompkin v. Philip Morris USA, Inc.*, 362 F.3d 882, 891 (6th Cir.2004) (internal quotations omitted). "A [trial] court abuses its discretion when it relies on clearly erroneous findings of fact, or when it improperly applies the law or uses an erroneous legal standard." *Id.*

In this case, upon JRH's motion in limine, the bankruptcy court excluded Mr. Leeman from trial because Mr. Adell failed to provide JRH with a Rule 26(a)(2) report prior to trial. Additionally, Mr. Adell similarly failed to provide an adequate response to JRH's interrogatory about Mr. Leeman's testimony: to JRH's interrogatory requesting "the substance of the facts and opinion to which the expert is expected to testify, and a summary of the grounds for each opinion," Mr. Adell merely responded that Mr. Leeman would testify "as to damages" and this response was never supplemented before trial. *See* Appellee Br. at 31. Nonetheless, after the

trial began on December 18, 2002, but before the trial concluded on January 14, 2003, Mr. Adell filed an expert report for Mr. Leeman on January 7, 2003. The bankruptcy court granted JRH's motion in limine on January 14, 2003.

Mr. Adell lodges two attacks on the bankruptcy court's exclusion of Mr. Leeman's testimony.

■ a. Mr. Adell first contends that Rule 26(a)(2) is inapplicable in this case. Mr. Adell correctly states that, pursuant to Administrative Order 00–04 of the Eastern District of Michigan, the discovery rules of the Federal Rules of Civil Procedure have been suspended in this judicial district for contested bankruptcy matters. This general suspension is necessary because most bankruptcy matters are quickly resolved and the discovery rules would simply delay the resolution of matters that could and should be expeditiously resolved.

However, pursuant to Administrative Order 00–04, this general suspension can be lifted when a court determines that discovery is necessary in a particular case. Here, the bankruptcy court explicitly ordered discovery. On July 15, 2002, when the bankruptcy court dismissed the involuntary petition, it also found that the record was insufficient to determine whether, as JRH alleged, Mr. Adell had filed his petition in bad faith, and, if so, the appropriate amount of damages to which JRH was entitled under § 303(i). Therefore, the bankruptcy court ordered the parties to engage in discovery into the issues of bad faith and damages. Consequently, the bankruptcy court lifted the general suspension of Administrative Order 00–04 thereby making Rule 26(a)(2) applicable to this case. Thus, Mr. Adell's argument against the applicability of Rule 26(a)(2) in this case is without merit.

■ b. Mr. Adell also argues that the bankruptcy court abused its discretion in excluding Mr. Leeman's testimony because there was, according to Mr. Adell, a substantial justification for the delay in producing Mr. Leeman's report. Again, a trial court can refrain from excluding evidence under Rule 37(c)(1) for violations of Rule 26(a)(2) if the violating party had a substantial justification for its noncompliance with Rule 26(a)(2). *See* Fed.R.Civ.P. 37(c)(1).

Mr. Adell claims that JRH failed, in violation of a court-appointed discovery master's order in November 2002, to provide financial information important to the production of Mr. Leeman's expert report. Mr. Adell argues that this failure is a substantial justification for the tardiness (i.e., mid-trial disclosure) of his expert report.

Mr. Adell's argument, however, is undermined by two facts. First, approximately three months prior to trial, in September 2002, JRH gave Mr. Adell fifteen boxes of financial documents containing the information that JRH's expert, Mr. Frazee, was using to prepare his damages analysis for trial. Mr. Adell's expert, Mr. Leeman, conceded that this information was produced: in his report of January 7, 2003, Mr. Leeman explicitly refers to the aforementioned boxes and the financial information contained therein. Second, more than two months prior to trial, on October 9, 2002, JRH disclosed its expert report to Mr. Adell. Thus, Mr. Adell's expert had a significant, if not a comprehensive, amount of financial information upon which to base his damages analysis well before trial.

While JRH's failure to comply with discovery master's order is unfortunate and could be considered **some justification** for Mr. Leeman's tardy export report, this failure is not a **substantial justification**

under Rule 37(c)(1) given the fact that, before the discovery master's order and well before trial, Mr. Adell had ample financial information to place at his expert's disposal. Additionally, Mr. Adell's expert report was not merely delayed, it was disclosed three weeks after the trial began and one week before the trial ended. Such a mid-trial expert disclosure is clearly contrary to the purpose behind Rule 26(a)(2) of disclosing expert testimony sufficiently in advance of trial so that the opposing party has a reasonable opportunity to prepare for the expert.

 Furthermore, "the trial court has enormous discretion in deciding whether a party's violation of the expert report rules is justified" under Rule 37(c)(1). *Sullivan v. Glock, Inc.*, 175 F.R.D. 497, 505 (D.Md. 1997); *see also McCarthy v. Option One Mortgage Corp.*, 362 F.3d 1008, 1012 (7th Cir.2004) ("[trial] courts enjoy broad discretion in controlling discovery."); *S. States Rack & Fixture, Inc. v. Sherwin–Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003) (trial courts have "broad discretion" under Rule 37(c)(1)); *Laplace–Bayard v. Batlle*, 295 F.3d 157, 162 (1st Cir.2002) ("[Trial] courts have broad discretion in meting out Rule 37(c) sanctions for Rule 26 violations."); *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 953 (10th Cir.2002) ("The determination of whether a Rule 26(a) violation is justified or harmless is entrusted to the broad discretion of the [trial] court."); *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir.2000) ("[Trial] courts have broad discretion to exclude untimely disclosed expert-witness testimony.").

In this case, given the fact that a large amount of financial information was made available to Mr. Adell for the preparation of an expert report well in advance of trial, the bankruptcy court acted well within its broad discretion when it excluded Mr. Leeman's testimony under Rule 37(c)(1). Un-

der the circumstances, it cannot be said that the bankruptcy court relied on clearly erroneous facts or that it improperly applied the law or used an erroneous legal standard. Accordingly, the bankruptcy court did not abuse its discretion in excluding Mr. Leeman's testimony. Reversal on the basis of Mr. Adell's Rule 37(c)(1) argument is unwarranted.

### C. Punitive Damages

 Mr. Adell further contends that the bankruptcy court erred in awarding $2,000,000.00 in punitive damages under 11 U.S.C. § 303(i)(2)(B).

Mr. Adell's first argument against the award of punitive damages is that, as already discussed above, he acted in good faith and on advice of counsel in filing the petition. As these arguments are rejected above, they are likewise rejected here.

 Mr. Adell's second argument against punitive damages is that the $2,000,000.00 amount is excessive because it goes beyond the purposes of punishment and deterrence. The standard of review for an appellate court's review of a lower court's award of punitive damages is as follows:

> [W]here a constitutional challenge to an award of punitive damages is made, [the appellate court] review[s] [the lower] court's determination de novo. Where no constitutional issue is raised, [the appellate] court reviews [the lower] court determination of the appropriate amount of punitive damages only for an abuse of discretion. A [lower] court abuses its discretion when it relies on clearly erroneous findings of fact ... or when it improperly applies the law or uses an erroneous legal standard. Under this standard, [the appellate] court reviews de novo the [lower] court's legal conclu-

sion, and reviews for clear error its findings of fact.

*Smoot v. United Transp. Union,* 67 Fed. Appx. 328, 329–30 (6th Cir.2003) (internal quotations and citations omitted). In this appeal, Mr. Adell has not raised a constitutional challenge to the bankruptcy court's punitive award; thus, this Court reviews the punitive award only for abuse of discretion.

The congressional purpose behind § 303(i) is straightforward:

[Congress designed § 303(i) because of a] concern ... that unprincipled creditors would [improperly] use or threaten use of involuntary bankruptcy.... For example, an unscrupulous creditor intoxicated by the easy availability of involuntary bankruptcy might seek its seductive company to lever payment of a legitimately disputed obligation, satisfy a personal grudge, or secure a business advantage by eliminating competition. Therefore, to deter those who might otherwise seek to take advantage of the ... liberal[ ] rules governing access to involuntary relief, the drafters incorporated into [§ ] 303 a provision that ... the bankruptcy court might assess ... punitive damages against any petitioning creditor found to have filed in bad faith.

Lawrence Ponoroff, "The Limits of Good Faith Analyses: Unraveling and Redefining Bad Faith in Involuntary Bankruptcy Proceedings," 71 Neb. L.Rev. 209, 212–13 (1992). Mr. Adell's abuse of the involuntary bankruptcy process in this case is precisely the type of conduct that Congress intended to punish and deter through the punitive damages provision of § 303(i)(2)(B). Accordingly, the bankruptcy court properly applied § 303(i)(2)(B), and, as a result, did not abuse its discretion in this regard.

Further, before assessing the punitive award, the bankruptcy court reviewed seven factual findings to support the award:

[Mr. Adell] was told and knew that JRH contested his claims. He withheld crucial information from his bankruptcy attorneys. He engaged in a campaign of publicity and disparagement with the specific intent to injure JRH. He threatened JRH with criminal prosecution. He flaunted his wealth [in an attempt to solicit creditors to join his involuntary petition]. He cynically asserted a false concern for creditors. He presented no credible mitigating considerations.

*JRH,* 291 B.R. at 739. Based on the record before this Court, these findings are not clearly erroneous, and, thus, the bankruptcy court's reliance on these findings to award $2,000,000.00 in punitive damages was not an abuse of discretion.

Moreover, while this punitive award appears to be the largest on record for a bad faith involuntary bankruptcy case (the largest to this point being $500,000.00, *see Landmark,* 189 B.R. at 317), it is an appropriate award given Mr. Adell's unprecedented use of the involuntary bankruptcy process to intentionally inflict injury as well as his actions to exacerbate the impact of this injury (e.g., hiring the public relations firm to publicize the involuntary petition).

### D. Fees and Costs

Lastly, Mr. Adell also contests the bankruptcy court's award of fees and costs. *See* 11 U.S.C. § 303(i)(A)(1). His only argument, however, is that because he filed the involuntary petition in good faith he should not be held liable for fees and costs. This argument has no substance. It merely states an obvious procedural truth: if this Court reverses the bankruptcy court's bad faith determination, then the Court should vacate the bankruptcy court's

award of fees and costs. As such, Mr. Adell's only argument against the fees-and-costs award is completely contingent upon the outcome of his bad faith arguments. Therefore, since the Court will affirm the bankruptcy court's bad faith determination, the Court will also affirm the bankruptcy court's fees-and-costs award.

## IV. CONCLUSION

**ACCORDINGLY, IT IS HEREBY ORDERED** that, for all the reasons set forth above, the judgment of the bankruptcy court and its underlying opinion regarding JRH's damages, dated April 25, 2003, are **AFFIRMED**.

**IT IS FURTHER ORDERED** that JRH is awarded costs in accordance with Bankruptcy Rule 8014.

**SO ORDERED.**